

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

ZOROASTRIAN CENTER AND )
DARB-E-MEHR OF METROPOLITAN )
WASHINGTON, D.C., )
)
    Plaintiff/Counterclaim Defendant, )
) Civil Action No. 1-13-cv-980
    -v- )
)
RUSTAM GUIV FOUNDATION, *et al.*, )
)
    Defendant/Counterclaim Plaintiff. )
)

## MEMORANDUM OPINION

This dispute arises from the alleged breach of an amended ninety-nine year lease entered into for the sole purpose of creating a Zoroastrian place of worship in the Washington, D.C. metropolitan area. Before the Court are the parties' cross-motions for summary judgment. For the reasons stated below the Court finds the Plaintiff/Counterclaim Defendant has materially breached every binding agreement between the parties, consequently judgment should enter as a matter of law in favor of the Defendant/Counterclaim Plaintiff on two of its counterclaims.

## BACKGROUND

The Defendant, Rustam Guiv Foundation ("RGF"), is a trust devoted to promoting the practice and advancement of Zoroastrianism, an ancient Persian religion. The Plaintiff, Zoroastrian Center and Darb-E-Mehr of Metropolitan Washington, D.C. ("ZCDMW") is a Virginia-based 501(c)(3) with the same mission as RGF. In 1991, RGF granted a ninety-nine year lease on almost seven acres of property located at 2347 Hunter Mill Road, Vienna, Virginia ("the Property") to ZCDMW. The sole purpose of the lease was the construction of a Zoroastrian center of worship. *See* Dkt. No. 56-3, Exh. C [hereinafter "the Original Lease"]. What followed

was a turbulent contractual relationship that spanned two decades before leading to this litigation.

RGF claims this is a simple contract dispute. This is only half true. The controversy does require the Court to interpret a series of agreements and determine whether they were breached. As will soon be evident, however, that seemingly simple task is complicated by the precarious nature of the parties' relationship as well as actions taken in light of their common mission. In recounting these actions the Court imputes no ill will to either party, both of whom have expended significant resources attempting to accomplish a shared charitable goal. Rather, the Court merely seeks to acknowledge the undisputed material facts of this contract dispute.

Two documents control the controversy's contours. The first is the Original Lease. Under the terms of the Original Lease ZCDMW was to pay a nominal rent of one dollar per year, as well as all utilities and taxes on the Property, for ninety-nine years. *See* Original Lease at ¶¶ 3.1, 4.1, and 5.1. ZCDMW's main obligation under the Original Lease is found in Article VI which outlines the use of the Property. That clause mandates that the Property "only" be used for: (i) "construction of a place of worship for all Zoroastrians of the world;" (ii) "construction of a facility for the advancement of the Zoroastrian religion;" and (iii) "construction of a dwelling suitable for residence of a Mobed (priest)." *See id.* at ¶ 6.1. Although the Original Lease did not include a firm deadline for this construction, it did contain a "time is of the essence" clause. *See id.* at ¶ 19.1.

For a variety of reasons not material to the Court's inquiry, and much to the frustration of RGF, ZCDMW did not begin actual construction on the Property for several years following execution of the Original Lease. This inaction led to the creation of the second principal document involved in the controversy: an amendment to the Original Lease. *See* Dkt. No. 56-4,

Exh. D [hereinafter "the Lease Amendment"]. This Lease Amendment was executed in January of 2009, over seventeen years after the Original Lease was signed. Importantly, the amendment noted that "[i]n the event of any conflict between the terms of the Lease and [the] Lease Amendment, the term of [the] Lease Amendment shall govern and control." *Id.* at § 2.

Although under the amendment it was possible for the lease term to extend through the year 2108, just a brief review of the document reveals that speeding the pace of constructing a place of worship was the motivating factor for the Lease Amendment. Several clauses of the document are pertinent. First, ZCDMW agreed to "undertake such construction no later than November 1, 2009 (the 'Start Date')." *Id.* at § 3. ZCDMW was also to "complete construction of the Center no later than March 13, 2011 (the 'Completion Date')." *Id.* The only adjustment to these firm deadlines contemplated by the Lease Amendment allowed RGF to extend the deadline for completion by two years. *See id.* at §§ 4 and 5. Importantly, however, the Lease Amendment stated that:

> Anything to the contrary notwithstanding, and regardless of any and all extensions of the Start Date and/or the Completion Date, the Center must be completed no later than March 15, 2013 (the "Final Completion Date"). If Lessee has not achieved completion of construction of the Center satisfactory to Lessor by the Final Completion Date, then Lessor may by written notice terminate the Lease.

*Id.* at § 6. Together the Original Lease and Lease Amendment governed the parties' lessor-lessee relationship, but that did not prevent other incidents from impacting their dispute.

The first such incident occurred at some point in the beginning of 2010. While the exact date of certain events may be uncertain, the record makes abundantly clear ZCDMW had not met the "Start Date" deadline for construction the preceding winter. Given this failure RGF began pursuing different options for the construction of a Zoroastrian place of worship in the

3

Washington, D.C. metropolitan area.[1] With RGF's focus shifting to this alternate site, the Trust requested that ZCDMW cease preparing construction on the Vienna property. On March 7, 2010, Dr. Daryoush Jahanian, who can best be described as RGF's lead trustee, sent ZCDMW an email noting that the alternative site would meet the needs of the regional Zoroastrian community and instructing ZCDMW members to "stop signing any contract and do not write any check as much as possible" for any construction activities on the Property. *See* Dkt. No. 56-6, Exh. F. On April 28, 2010, Farhad Shahryary, ZCDMW's joint secretary, responded to RGF's request with a formal letter stating the following:

> Your recommendation of ceasing all efforts towards building of the Zoroastrian Center and Darb-E-Mehr of Metropolitan Washington, D.C. (ZCDMW) has us puzzled and discouraged... The Zoroastrian community was in shock, disbelief, and was hurt by your recommendation. For the past twenty years, the majority of them believed and was proud that the Hunter Mill property was their place for worship... Your recommendation does not reflect the fact, that at the time you reassigned the lease to ZCDMW, that you were well aware of [the construction of the alternate temple], you had sided with ZCDMW, and in 2007 declared your decision... that this property should remain as the Zoroastrian Center...
>
> In order to fulfill its duties, ZCDMW has maintained this property while spending a large portion of its funds in preparation of the planning, constructing, and renovating of the Center...
>
> [ZCDMW] considered your recommendation, temporarily stopped the progress of work as suggested by you, and discussed the matter with the Zoroastrian Community. It was determined, that in the best interest of the Zoroastrian community of Metropolitan Washington, D.C., area ... to stay on course with the mission before us by continuing to progress and move [*sic*] forward, avoiding the creation of any obstacles or factions, in pursuits of continued Good Thoughts, Good Words, and Good Deeds.

*See* Dkt. No. 67-3, Exh. 6.

To summarize, by the end of April, 2010: (i) the Original Lease had been amended and now included particular construction deadlines, the first of which ZCDMW had missed; (ii) RGF had chosen to focus its efforts to construct a place of worship on an alternative site and had

---

[1] This effort has consistently been referred to as the "Camran" or "Kamran" Temple in Boyds, Maryland.

4

requested ZCDMW cease its construction efforts on the Property; and (iii) ZCDMW did momentarily cease such activity, but eventually decided to proceed with the project despite RGF's admonition not to do so.

The next event relevant to the contract dispute arose a year later in April of 2011. Although what occurred between 2010 and 2011 is far from certain, the legally material facts are undisputed. On March 31, 2011, Jahanian sent an email to Shahryary outlining the plans for an in-person meeting between the parties to discuss their future relationship. *See* Dkt. No. 56-8, Exh. H. The email acknowledged that RGF had "requested construction be cease[d]," and noted that the parties' shared goal of creating a place of worship would "become practical only with our goodwill and full co-operation." *Id.* The subsequent meeting occurred on April 16, 2011, and lasted several hours. At the close of the meeting Dr. Soroosh Sorooshian, an RGF trustee, drafted a one-page, hand-written Memorandum of Understanding that was signed by representatives of each party. *See* Dkt. No. 56-9, Exh. I. [hereinafter "the 2011 MOU"]. This Memorandum of Understanding included provisions stating that:

> 1- The Trust of Rustam Guiv Foundation will be in full cooperation with ZCDMW in facilitating the required paperwork.
>
> 2- ZCDMW will provide to The Trust an accounting book to list the names [and] amounts of all donations and all expenses. ZCDMW will also continue to provide quarterly financial report [and] account summary of all donations and expenses.
>
> 3- ZCDMW will provide an accomplishment plan with milestones [and] deadlines, mutually agreed by the Two parties...
>
> ...
>
> 6- Items 2, 3 and 5 above will be provided on or before 5/15/2011 and must be approved by The Trust.

*See id.*

On May 15, 2011, Shahryary sent Jahanian and other RGF trustees an email "responding to [RGF] as a result of [their] meeting." *See* Dkt. No. 56-10, Exh. J at 1. This email identified updates on ZCDMW's organizational structure, its plan to get architectural designs approved by "the authorities," and ZCDMW's available cash. *Id.* The email also noted that Shahryary would be resigning his position for personal reasons and handing over his responsibility to "the new group." *Id.* Jahanian responded to this email four days later by outlining RGF's continued concerns which included a fear that ZCDMW would "proceed and at the middle of construction due to insufficient fund stop [*sic*]." *Id.* at 2.

On April 20, 2013—approximately two years after the 2011 MOU was drafted; four years after the Lease Amendment was executed; and over twenty years after the Original Lease was signed—RGF sent ZCDMW a formal notice of termination. *See* Dkt. 56-11, Exh. K [hereinafter "the Lease Termination"]. The Lease Termination acknowledged that:

> The Lease imposes certain performance obligations on Lessee, which include among others: (a) the obligations to undertake construction of Darb-e-Mehr Religious Center (the "Center") no later than November 1, 2009 and to complete construction of the Center no later than March 15, 2011 (section 3 of the Lease Amendment); and (b) regardless of any provisions allowing for possible delays the absolute requirement to complete the Center no later than March 15, 2013, the "Final Completion Date" (section 6 of the Lease Agreement). . . The Center has not been completed and the Final Completion Date is past.

*Id.*

On May 14, 2013, ZCDMW filed a civil complaint in the Circuit Court of Fairfax County seeking a declaratory judgment that the ninety-nine year lease was still in effect. *See* Dkt. No. 1-1. ZCDMW also filed a Memorandum of *Lis Pendens* on the Property in the Fairfax County land records. *See* Dkt. No. 67-5. On August 13, 2013, RGF removed the action to this Court and submitted a Motion for Judgment on the Pleadings. *See* Dkt. Nos. 1 and 3. After multiple rounds

of briefing the Court found that it had jurisdiction to hear the case and denied RGF's attempts to dismiss the matter. *See* Dkt. Nos. 22 and 36.

Meanwhile, RGF submitted a Counterclaim Complaint attached to its Answer. This Counterclaim Complaint requests relief under theories of: breach of contract (Counterclaim Count I); slander of title (Counterclaim Count II); and quiet title (Counterclaim Count III). After being granted leave to amend, ZCDMW amended its complaint. ZCDMW's new complaint requests that the Court: declare that the Original Lease is in full force and effect (Count I); enjoin and restrain RGF from interfering with ZCDMW's rights under the terms of the Lease Agreement (Counts II and III); or, in the alternative, find that RGF has breached the lease and award ZCDMW corresponding damages (Counts IV). *See* Dkt. No. 56.

After conducting discovery the parties submitted the cross-motions for summary judgment currently before the Court. *See* Dkt. Nos. 66 and 69. Oral argument was held on April 25, 2014, and the Court took the matter under advisement.

## DISCUSSION

### I. Standard of Review

Summary judgment should be granted where the evidence in the record "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court explained, "this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.* Finally, in making a summary judgment determination, the Court must view the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

## II. Breach of the Contract

As noted at the outset, although it involves a complicated and lengthy lessor-lessee relationship, this case is fundamentally a contract dispute. *See, e.g.*, *Clark v. Harry*, 29 S.E.3d 231, 233 (Va. 1944) ("a lease is a contract" (citing *Smith v. Payne*, 151 S.E. 295, 299 (Va. 1930)). To prevail on its breach of contract claim, each party must show (i) a legally enforceable obligation; (ii) violation or breach of that obligation; and (iii) injury or damage caused by the breach. *See Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 135 (Va. 2009) (citing *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)). There are two potential agreements that could have been breached, the lease agreement (which is made up of the Original Lease and Lease Amendment) and the 2011 MOU.

### a. The Lease Agreement

Regardless of what other factors may motivate the relationship between RGF and ZCDMW, this controversy arises out of a landlord-tenant arrangement. It is thus private in nature and governed entirely by the lease agreement. *See, e.g.*, *Va. Poverty Law Ctr., Inc. v. Pollard & Bagby, Inc.*, 1 Va. Cir. 365, 369 (City of Richmond 1983). As the merger clause mandates, the Lease and Lease Amendment formed a complete, integrated, and unambiguous agreement. *See* Lease Amendment at § 2. The Court is therefore obligated to give the clear terms of that integrated agreement, which provide the law of the case, their plain and ordinary meaning. *See Marina Shores, Ltd. v. Cohn-Phillips, Ltd.*, 435 S.E.2d 136, 138 (Va. 1993) (citing *Winn v. Aleda*

*Const. Co.*, 315 S.E.2d 193, 194 (Va. 1984); *Marriott Corp. v. Combined Properties*, 391 S.E.2d 313, 316 (Va. 1990)).

The only major inconsistency between the Original Lease and Lease Amendment is the lack of deadlines in the former. This alteration gets to the very heart of the lease arrangement's purpose as well as this dispute. As the parties' agreement indicates, "[i]n the event of any conflict between the terms of the Lease and [the] Lease Amendment, the terms of [the] Lease Amendment shall govern and control." Lease Amendment at § 2. This is not surprising given that the Lease Amendment was entered into in order to expedite the sole purpose of the contract: construction of a Zoroastrian place of worship on the Property. To meet this end the Lease Amendment imposes three distinct and specific deadlines on ZCDMW: the 2009 Start Date; the 2011 Completion Date; and the 2013 Final Completion Date. ZCDMW has failed to meet every one of these deadlines. Each one of these failures constituted a material breach of the lease agreement. *Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997) ("[a] material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract" (citations omitted)).[2]

This much would end the matter in most cases. Here, however, things are complicated by the course of dealings between the parties. Under the explicit terms of the contract, ZCDMW's first breach occurred on November 1, 2009. Several months later, in March of 2010, RGF sent the email directing ZCDMW to cease construction activities on the premises. This email could arguably be interpreted as a written notice terminating the lease. There is in fact evidence in the record that members of both ZCDMW and RGF interpreted the email this way. To have legal

---

[2] Throughout this litigation ZCDMW has presented evidence of its continued preparations to begin construction on the Property in an attempt to show that it has not breached the agreement. Even assuming that such preparations have occurred, the Lease Amendment explicitly differentiates between "preparation" and "construction." *See* Lease Amendment at § 3. The deadlines all refer to the latter. *Id.* Therefore ZCDMW's preparatory activities do not render its failures to construct immaterial.

9

effect, however, a notice to terminate a tenancy must be explicit and positive. *See, e.g., Baltimore Dental Ass'n v. Fuller*, 44 S.E. 771, 772 (Va. 1903). Moreover, the parties' actions do not indicate a termination of the lessor-lessee relationship. ZCDMW continued to prepare for construction, pay taxes on the property, and fundraise for the temple—all while RGF made no attempts to terminate the tenancy or evict its tenant. This provides an example of a continuing theme of the controversy: the parties' actions are often times difficult to reconcile with the documents governing their relationship.

One obvious legal explanation for the parties' actions following ZCDMW's initial material breach is that once ZCDMW failed to meet the Start Date deadline, the lease agreement became voidable and RGF merely elected not to terminate the contract immediately. *See, e.g.*, Restatement (Second) of Contracts § 7.

Another convincing explanation for the apparent disconnect between the parties' actions and RGF's right to terminate the contract as early as 2009 can be found in the Lease Amendment's extension provisions. Sections 4 through 6 of the Lease Amendment contemplate a two-year extension of the Start and Completion Date deadlines. It is true that any such extension was to be in a signed writing executed by March 15, 2011, but the course of dealing between the parties indicates that this requirement was waived. *See Goldstein v. Old Dominion Peanut Corp.*, 15 S.E.2d 103, 106 (Va. 1941) (the course of dealing between parties is admissible to show whether they have waived any conditions of a contract between them). The impact of these extensions is limited by the dispositive clause of the entire lease agreement, which provides that *"regardless of any and all extensions* of the Start Date and/or the Completion Date, the Center *must* be completed *no later than March 15, 2013* (the 'Final Completion Date')." *See* Lease Amendment at § 6 (emphasis added). ZCDMW did not meet this

final deadline. Any failure to meet this absolute deadline gave RGF the right to terminate the Lease, which it explicitly did on April 20, 2013.

Having found that ZCDMW materially breached the lease agreement and that RGF exercised its right to end the lease through its explicit termination notice, the Court now turns to whether the 2011 MOU altered the legal relationship between the parties.

### b. The 2011 Memorandum of Understanding

There are three potential readings of the 2011 MOU. First, the Court could accept RGF's argument that the 2011 MOU is an unenforceable agreement. Second, the Court could accept ZCDMW's argument and read the 2011 MOU as a modification of the lease arrangement. Third, the Court could read the 2011 MOU as a binding contract unrelated to the Original Lease or Lease Amendment. None of these readings, even if accepted as true, alter the outcome of this case.

This Court has long recognized the well-settled principle in Virginia that agreements to agree in the future are "too vague and too indefinite to be enforced," and that a binding contract requires "'mutual commitment' by the parties." *See Beazer Homes Corp. v. VMIF/Anden Southbridge Venture*, 235 F. Supp. 2d 485, 490-91 (E.D. Va. 2002) (citing *W.J. Shafer Assoc., Inc v. Cordant, Inc.*, 493 S.E.2d 512 (Va. 1997); *Allen v. Aetna Cas. and Sur. Co.*, 281 S.E.2d 818 (Va. 1981)). The 2011 MOU between RGF and ZCDMW is extremely ambiguous and, were it not for the extensive history between the parties, would unarguably be unenforceable on its face. *See generally Stanley's Cafeteria, Inc. v. Abramson*, 306 S.E.2d 870, 873 (Va. 1983) ("a course of dealing by contracting parties, considered in light of all the circumstances, may evince mutual intent to modify the terms of their contract."). Even considering the course of dealing between the parties, it is still difficult to decipher what mutual obligations exist as a result of the

11

document. The most definite clauses in the 2011 MOU outline broad tasks for ZCDMW to complete. None of these tasks contradict the express and unambiguous terms of the Lease Amendment. Moreover, the record makes abundantly clear that ZCDMW failed to complete most of the outlined tasks.

In sum, the 2011 MOU is too vague to be enforceable. Even if it were read as a modification of the lease arrangement—a reading this Court does not endorse—nothing in the 2011 MOU eliminates or alters the dispositive deadlines in the Lease Amendment. Therefore, even if the 2011 MOU was part of the integrated lease agreement—which it does not appear to have been—RGF still had the right to terminate the tenancy after ZCDMW failed to meet the "Final Completion Date" in March of 2013. Finally, even if the 2011 MOU did create a legally enforceable agreement independent from the lease—which it did not—ZCDMW breached that hypothetical agreement by failing to carry out the tasks outlined within it. Accordingly, under any interpretation of the document, the 2011 MOU does nothing to alter the Court's conclusion that ZCDMW materially breached the integrated lease agreement.[3]

### III. ZCDMW's Additional Attempts to Nullify the Lease Amendment

In addition to its core arguments regarding its breach of contract claims, ZCDMW attempts to mitigate the analysis above by presenting further grounds for the Court to nullify certain effects of the Lease Amendment. None of these arguments alter the outcome of this case.

---

[3] ZCDMW urges the Court to allow parole evidence when interpreting the meaning of the 2011 MOU. The result would remain the same even if such evidence were allowed since the record shows that neither party believed the 2011 MOU altered the terms of the voidable lease, nor did they intend for the 2011 MOU to have that effect. *See, e.g.*, Affidavit of Daryough Jahanian, Dkt. No. 74-6 at ¶ 11 ("[RGF] understood this document to set forth a series of steps that ZCDMW could take to regain our trust"); Deposition Testimony of Farhad Shahryary, Dkt. No. 67-3 at 28:17 (describing his understanding that the lease was not binding at the time he signed the 2011 MOU on behalf of ZCDMW). *See also American Realty Trust v. Chase Manhattan Bank, N.A.*, 182 S.E.2d 825, 831 (Va. 1981) ("[a]lthough contractual provisions may be subject to a rule of strict construction, the intention of the parties is the controlling factor" (citing *Traylor v. Holloway*, 142 S.E.2d 521, 523 (Va. 1965))).

### a. Effectiveness of RGF's Actions

The first such additional claim ZCDMW makes is that the Lease Amendment is null and void because it was only executed by Jahanian and no other RGF trustees approved the action. It is true that Jahanian was the only trustee who executed the Lease Amendment on behalf of RGF. The question therefore is whether this action renders the Lease Amendment void or voidable. *See generally Princess Anne Hills Civic League v. Susan Constant Real Estate Trust*, 413 S.E.2d 599 (Va. 1992). In order to answer this question, the Court must first determine whether RGF had the power to enter into the Lease Amendment. *See id.* at 604 ("when a contract of a corporation is *ultra vires* in the proper sense, *i.e.*, beyond the powers conferred upon it by the legislature, it is not only voidable, but wholly void and of no legal effect." (citing *Norton Grocery Co. v. Bank*, 144 S.E.2d 501, 502-03 (Va. 1928)). If RGF had the power to enter into the Lease Amendment, then its action is not void but voidable. *Id.*[4]

Under the explicit terms of the RGF Trust Agreement, RGF has the power to "receive the income, profit, rents, and proceeds of the trust fund, and to collect and receipt for the same." *See* RGF Trust Agreement, Dkt. No. 12, Exh. B. The Trust also has the power to "make, execute, and deliver all instruments necessary or proper for the accomplishment of the purposes of this trust. . . including deeds, bills of sale, transfers, leases, mortgages, [etc.]." *Id.* RGF therefore has the power to enter into arrangements such as its lease agreement with ZCDMW.

RGF, however, did not execute this power properly. The RGF Trust Agreement states that "the Trustees shall act by a vote of majority of their numbers at any given time. . . all actions of the Trustees shall be taken either by resolution at a meeting or by written record without a meeting. *Id.* at ¶ 5. ZCDMW clings to this language and the fact that Jahanian did not meet these

---

[4] ZCDMW does not argue that the Original Lease is void, presumably because the document was signed by every RGF trustee serving at the time of execution.

13

requirements in order to argue that the Lease Amendment is void. While the factual premise of this argument is irrefutable, ZCDMW's subsequent legal conclusion is a misstatement of the law.

Because RGF had the power under the Trust Agreement to execute the Lease Amendment, but merely failed to do so properly, it cannot be said that Jahanian's action was *ultra vires*. The Lease Agreement was thus merely voidable and subject to ratification. *See Princess Anne Hills Civic League*, 413 S.E.2d at 604 (citing *Crump v. Bronson*, 191 S.E. 663, 667 (Va. 1937)). At the time Jahanian executed the Lease Agreement there were five RGF trustees in total. Jahanian obviously agreed to the amendment. Two other RGF trustees, Dr. Bruce Nadjmi and Sorooshian, filed notarized affidavits stating that they were both "advised and informed of the terms of the Lease Amendment [and] consented to it" as well. ZCDMW has provided no evidence to refute these claims of ratification.

Taken as a whole, this demonstrates that RGF had the power to enter into the Lease Agreement but did not do so properly. The Lease Amendment was therefore voidable until ratified by a majority of RGF trustees, which it was. Upon that ratification the Lease Amendment became a binding agreement, just like the Original Lease. The Court therefore refuses to accept ZCDMW's claim that the Lease Amendment is void and without effect.[5]

### b. Estoppel

ZCDMW's next attempt to void the effect of the Lease Agreement is found in its claim of equitable estoppel. Specifically, ZCDMW argues RGF should be estopped from enforcing the document in light of Jahanian's March 7, 2010 email directing ZCDMW to cease construction activities on the Property. To establish its equitable estoppel claim ZCDMW must show (1) a representation, (2) reliance, (3) change of position, and (4) detriment. *See, e.g., Princess Anne*

---

[5] ZCDMW also raised an argument in its opening summary judgment memorandum that the Lease Amendment was void because it was not based on adequate consideration. ZCDMW has since conceded that this argument is meritless.

*Hills Civic League*, 413 S.E.2d at 603. Equitable estoppel is "applied rarely and only from necessity," and ZCDMW must prove "each element by clear, precise, and unequivocal evidence." *Id.* (citing *Dominick v. Vassar*, 367 S.E.2d 487, 489 (Va.1988) *Hyson v. Dodge*, 96 S.E.2d 792, 795 (Va. 1957); *Baker v. Preston*, 21 Va. (Gilmer) 235, 300 (1821)).

The record demonstrates that ZCDMW did not rely on RGF's representation, nor did it change its position in light of Jahanian's correspondence. At best the undisputed facts show that ZCDMW momentarily halted its already lingering pre-construction activities when it received Jahanian's email. As noted above, ZCDMW then sent RGF a formal letter outlining its decision to ignore Jahanian's directive and to resume its activities instead. This brief pause, resulting in no material change in ZCDMW's position, cannot be said to represent detrimental reliance. ZCDMW's equitable estoppel claim is therefore dismissed.

### c. Sublease Arrangement

Finally, ZCDMW claims that the lease was assigned to the Zoroastrian Association of Metropolitan Washington ("ZAMWI"). According to ZCDMW, this alleged assignment to ZAMWI somehow eliminates RGF's ability to enforce the terms of the Original Lease and Lease Agreement. Putting aside the dubious nature of ZCDMW's legal argument on subleases generally, the record demonstrates that the lease interest was never actually assigned to ZAMWI. While it does appear that RGF invited ZAMWI to consider taking over ZCDMW's interest in the Property, ZAMWI explicitly rejected the offer. In a letter dated October 24, 2008, ZAMWI's Board of Trustees wrote to RGF indicating that they had "decided not to take assignment of the lease between ZCDMW and the Guiv Foundation." *See* Dkt. No. 74, Exh. 4. With the non-existence of an executed sub-lease assignment proven, ZCDMW's final argument as to why RGF cannot enforce the terms of the lease agreement fails.

## IV. RGF's Counterclaims

Having found that ZCDMW did breach the terms of its lease agreement with RGF, the only issues remaining pertain to the final two counts of RGF's counterclaim complaint.

### a. Slander of Title

Based on the memorandum of *lis pendens* filed by ZCDMW, RGF states a claim of slander of title in the second count of its counterclaim complaint. To prove slander of title, RGF "must show that the defendants acted with malice or in reckless disregard of the truth or falsity of the statement" in the memorandum. *Wright v. Castles*, 349 S.E.2d 125, 129 (Va. 1986) (citing Annot. 4 A.L.R. 4th 532 (1981 & Supp.1986)). In light of the Court's ruling on the breach of contract claims it may appear that ZCDMW's filing of the memorandum was improper. There is absolutely no evidence in the record however that this error was carried out with malice. Consequently, RGF's slander of title counterclaim fails.[6]

### b. Quiet Title

In its counterclaim complaint RGF also raises a claim to quiet title and requests this Court strike the memorandum of *lis pendens* from the Fairfax County land records. *See* Dkt. No. 7. At its core, an action to quiet title exists so that an entity with good title to real property not be "subjected to various future claims against that title." *See State of Maine v. Adams*, 672 S.E.2d 862, 865 (Va. 2009). Having found that ZCDMW materially breached the terms of its lease agreement with RGF and that RGF properly terminated ZCDMW's tenancy in 2013, the Court agrees that ZCDMW's memorandum of *lis pendens* should be struck from the land records.

---

[6] While the Court dismisses the slander of title claim because there is no evidence of malice, it is also likely that the memorandum of *lis pendens* is protected by privilege. *See Donohoe Constr. Co. v. Mount Vernon Ass.*, 369 S.E.2d 857 (Va. 1988) (defendant entitled to defense of absolute privilege in slander of title suit arising from filing of a mechanic's lien when words used in the lien memorandum were relevant and pertinent to the dispute).

## CONCLUSION

For the reasons stated above, the Court concludes that ZCDMW breached the material terms of its lease agreement with RGF and that RGF properly terminated ZCDMW's tenancy in April, 2013. ZCDMW's complaint is therefore dismissed with prejudice in its entirety. RGF's second counterclaim (slander of title) is likewise dismissed with prejudice. The Court finds in favor of RGF on its remaining two counterclaims (breach of contract and quiet title).

A corresponding order shall issue.

May 12, 2014
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge