```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
                       Alexandria Division




------------------------------:
                              :
ZOROASTRIAN CENTER AND        :
DARB-E-MEHR OF METROPOLITAN   :
WASHINGTON, D.C.,             :
                Plaintiff,    :
                              :
     -vs-                     :        Case No. 1:13-cv-980
                              :
                              :
RUSTAM GUIV FOUNDATION, et al.,:
                Defendants.   :
                              :
------------------------------:
```

HEARING ON MOTIONS

April 25, 2014

Before:  Liam O'Grady, USDC Judge

<u>APPEARANCES:</u>

Robert L. Vaughn, Jr., Counsel for the Plaintiff

Billy B. Ruhling, II, Counsel for the Defendants

2

1          THE CLERK:  Civil action 1:13-cv-980, Zoroastrian

2   Center and Darb-e-Mehr of Metropolitan Washington, D.C. versus

3   Rustam Guiv Foundation, et al.

4          MR. RUHLING:  Good afternoon, Your Honor.  Bill

5   Ruhling on behalf of Rustam Guiv Foundation and its trustees.

6          THE COURT:  Good morning.  Good afternoon.

7          MR. VAUGHN:  Good afternoon, Your Honor.  Robert

8   Vaughn on behalf of -- I will refer to it as ZCDMW.

9          THE COURT:  That's fine with me.

10          MR. VAUGHN:  Say that real fast and see what you come

11   up with.

12          THE COURT:  Yeah.  All right.  We are here for I

13   guess crossmotions for summary judgment.  Now I think we have

14   the documents that you all have been talking about, and the

15   e-mails, and the lease, and the amended lease, and the

16   memorandum of understanding.

17          You know, I think that the lease and the amended

18   lease are one document.  And they identify termination dates.

19   And that you can't parse them out and use them for one purpose

20   but not another purpose.  They are what they are.

21          And then we look at the conduct of the parties moving

22   forward from the date of the amendment, and we see activity in

23   two different ways.  One, we've got e-mail saying, stop what

24   you're doing, there is no need for you to do anything more,

25   we're going to go to Maryland, and stop what you're doing.

1           And then the Maryland site falls apart, and then you

2    have got this memorandum of understanding, which is nothing

3    more than an agreement to get an agreement that puts direction

4    back to using the Fairfax property to build the building for

5    its use by the Zoroastrians.

6           And then you go forward from the memorandum of

7    understanding, and there are certain activities which are

8    agreed to and money spent, up until we get -- and taxes and --

9    real estate taxes paid and other fees paid.  And then we get to

10   2013 when the letter terminating the lease comes on April 20.

11          So that's the way I see what occurred.  And the lease

12   has a provision which allows for a two-year extension of the

13   building if there is progress being made, which would get us to

14   March of 2013.  It does not appear to me that there was ever

15   completion.  The lease amendment requires that any extension

16   beyond 2011 be in writing.  There was no writing, but there

17   certainly was work being done, agreement to continue work,

18   payments being made by the lessee to Fairfax County and the

19   Commonwealth of Virginia.  So although there is no writing,

20   there is performance beyond 2011.

21          But we get to 2013 to April, and it seems to me that

22   the termination is permissible at that time based on the

23   original and amended lease.  And I don't believe that this

24   memorandum of understanding has any legal significance, it's

25   not binding.

4

1          So I will give you an opportunity to talk me out of

2     it or talk me into it, but that's where I am after looking at

3     the documents.

4          MR. VAUGHN:  Well, I believe that would then fall in

5     my ballpark, Your Honor.  I am going to attempt to snap victory

6     out of the jaws of defeat.

7          I would start with the premise, twofold, that the

8     lease amendment is no longer an operative document certainly as

9     of April of 2011, and then certainly I want to address the

10    issue of whether or not the MOU is an agreement to agree or it

11    is an actual agreement.  Obviously, I believe it's the latter.

12         As far as the lease amendment is concerned.  First

13    and foremost in terms of whether or not that is an operative

14    document, is what transpired thereafter.  And I don't think,

15    with all due respect to the Court, you can ignore that.  As the

16    Court itself acknowledged that what happened subsequent to that

17    is that RGF, which I will call Rustam Guiv -- at least I have

18    come accustomed to using that acronym, if that's okay with

19    those abbreviations.

20         THE COURT:  Go ahead.

21         MR. VAUGHN:  RGF -- let me even go back one step

22    farther.  This for all intense and purposes, this "lease

23    arrangement" was not your traditional arm's length

24    landlord/tenant type of agreement.  It is not like my lease at

25    my office.  I have got a building owner who then is going to

1    lease me a portion, and at some level they don't care what I do

2    or don't do as long as I don't violate the terms of the lease.

3           This was, not in a formal sense, but certainly in a

4    practical sense, a joint venture arrangement where Rustam Guiv

5    was going to own the land.  Zorosastrian was going to -- or

6    ZCDMW was going to, in effect, develop it if you will.  But

7    they viewed it and acted throughout as if there was a

8    relationship between the two because there in fact was.

9           Because what happened in 2007 before the lease

10   amendment is that RGF had made a determination, we're going to

11   turn the lease over to a third Zoroastrian organization, ZAMWI,

12   Z-A-M-W-I -- which I have forgotten what that stands for.  But

13   in any event, they were going to turn the lease over to those

14   folks, and they in effect were going to become the landlord and

15   administer the lease from that point forward.

16          I think the record is not clear that that was ever

17   undone.  Dr. Jahanian, who was the representative of RGF at the

18   deposition, confirmed that there was a fully executed

19   assignment of that lease.  He said it in his deposition.  I

20   cited to the page and line numbers in my memo.  And I have

21   asked through discovery for that document, and it has never

22   been produced.  I have also --

23          THE COURT:  What impact does that have on the lease

24   and the amended lease that I have?

25          MR. VAUGHN:  Well, the basic impact would be that RGF

6

1    is not the party who holds the lease at this point in time.

2    It's ZAMWI -- I think it is Z-A-M-W-I.  I may have said

3    Z-A-W-M-I.  Anyway, that when a lease assignment was executed,

4    which was confirmed by RGF's representative, RGF is essentially

5    out of the picture.

6            And so, I asked at deposition, where is the document

7    that transferred the lease back to RGF?  And Dr. Jahanian was

8    not able to identify any such document.  So I think --

9            THE COURT:  Is an assignment allowed in the lease,

10   original lease?  I frankly don't know.

11           MR. VAUGHN:  I don't know the answer to that, but

12   certainly my client did not object to it.  In fact, I believe

13   my client was a party because Dr. Jahanian spoke of all three

14   parties having executed the assignment.

15           THE COURT:  All right.

16           MR. VAUGHN:  So my client certainly accepted the

17   assignment, and we don't object to at this point.

18           THE COURT:  Okay.

19           MR. VAUGHN:  So there is a fundamental aspect of the

20   case that has not been addressed, and through discovery I don't

21   think RGF can address it, is their standing as the current

22   holder of the lease.

23           THE COURT:  Right.

24           MR. VAUGHN:  So I think that is sort of even before

25   we get to the lease --

```
1              THE COURT:  That would change the picture.
2              MR. VAUGHN:  And I think it does.  And I think Dr.
3   Jahanian again specifically testified there was a written
4   agreement, all parties signed, and it was never returned.  But
5   we have never seen that document, it has never been produced.
6   And the burden -- well, I will leave it at that.
7              As far as --
8              THE COURT:  The only testimony is there is an
9   assignment and no return --
10             MR. VAUGHN:  That is correct.  That was Dr.
11  Jahanian's testimony, the corporate designee of RGF, and for
12  all intents and purposes RGF in persona, if you will.
13             Then we get to -- that's what precipitated -- well,
14  things kind of went down that path in the 2007 time frame.  And
15  for whatever reason, I don't know because it's never been
16  established either way, and I don't know that it is necessarily
17  relevant, sometime in 2009 because something wasn't moving
18  forward otherwise, ZAMWI wasn't doing whatever RGF wanted them
19  to do, they stepped back in as if they are the holder of the
20  lease --
21             THE COURT:  Right.  All the e-mails are from
22  Jahanian.
23             MR. VAUGHN:  Yes, sir.  I don't think there is a
24  single document from anybody on RGF's side other than Jahanian.
25  And I don't think there is -- there might be one from ZAMWI in
```

1    there.  And perhaps I should know all the documents better than

2    I do at the moment, but I recall one anyway.

3              THE COURT:  Okay.

4              MR. VAUGHN:  But for whatever reason, it wasn't going

5    the way everybody wanted it to go, or at least RGF wanted it to

6    go, so they proposed this lease amendment.  And perhaps in the

7    scheme of things, it may not have any great legal significance,

8    but I felt compelled to notice that through the testimony of

9    Dr. Jahanian, or to note that through the testimony of Dr.

10   Jahanian said that it was RGF -- excuse me, ZCDMW who proposed

11   that document out of the blue, that RGF had nothing to do with

12   it.

13             And ultimately counsel, to his credit, conceded that

14   that was not correct testimony.  That was in my memorandum, and

15   I have not heard anything to the contrary.  And subsequent to

16   that, we produced what I provided and attached to my

17   memorandum, a letter from Dr. Jahanian, this is the one that's

18   in Farsi that we had the translation for, where he sent it to

19   my clients and said, sign.

20             Now, initially my position was, and it was wrong,

21   that there wasn't consideration to support that.  I went back

22   after filing the brief and noticed the extension or renewal, if

23   you will, of the lease term.  And I concede that that is

24   sufficient consideration.  So I have withdrawn that aspect of

25   it.

1          But in 2009 this lease amendment was executed.  And I

2     say it is invalid at that point because there is no authority

3     on behalf of RGF to enter into that document.

4          The trust agreement in paragraph 5 requires one of

5     two things for the trust to be able to act.  It can actually be

6     three ways, and I will go through all three.  The traditional

7     corporate sense of the word, if you will, there has to be a

8     meeting and a resolution passed.  There has to be a consent in

9     writing signed by the various trustees agreeing to the action.

10    Or ultimately all the trustees -- or the majority of the

11    trustees themselves have to sign off on the document.  And that

12    never happened.

13         Again, through the course of discovery we asked for

14    whatever corporate documents there were that related to that.

15    None have ever been produced.  No e-mails have ever been

16    produced that says, we consented to the amendment as trustees.

17    Nothing has ever been shown that that document was a document

18    that was authorized by RGF.  And again, I think that clearly

19    would be their burden to show.

20         And I draw the distinction between that and the MOU.

21    The MOU was in fact signed by three of the trustees, which is a

22    majority.  Which makes it a valid document.

23         So I think initially the lease amendment is not a

24    valid document because it wasn't authorized by the trust.  It

25    is a null and void act.  So it never becomes a deadline, if you

1   will.

2          And then we have the second aspect of that, is what I

3   have referred to, whether you use the term "estoppel" or

4   "waiver," I don't know that it makes a whole lot of difference,

5   but because -- in this again interim time, RGF is sort of like

6   a wondering husband, they fell in love with ZAMWI.  And then

7   that didn't work out too well, so they go back to their first

8   love.  And then fall in love with Mr. Kamran sometime in 2010

9   after this lease amendment is entered into.

10          And it sounds like Kamran is going to do what RGF

11   wants.  We want a temple, we want it now, so to speak, and so

12   we are going to throw our weight behind Kamran.  And going back

13   to this concept that this is a joint venture, they tell ZCDMW,

14   we want your money.  It is effectively our money, we need to

15   just run the books, make sure everything is accurate, then you

16   turn it over, and we're going to use it as we see fit, i.e. in

17   this case to support the Kamran project.

18          They were told that in February of 2010 in a series

19   of e-mails.  There was a phone call on March 5 in which Dr.

20   Jahanian again reiterated RGF's position.  My client throughout

21   is saying, no, no, don't pull the plug, Kamran is not the right

22   way to go, we've got a big organization here, it will serve

23   more people here, this is what this thing was planned for back

24   since 1999, we need to move forward with that.

25          RGF thereafter on March 10, despite that plea, says,

1   no, there is only going to be one, it's going to be Kamran,

2   stop construction, turn the money over to us.  That's their

3   e-mail on March 10 of 2010.  And they reiterate that for

4   several other communications between the parties.

5          On April 28 because they had concerns, April 28 of

6   2010, ZCDMW writes to Dr. Jahanian, RGF in reality, and says,

7   we disagree with your decision.  And if we stop, then you're

8   going to complain and say we breached the amendment.  They told

9   them, if you do that -- if we do what you say, you're going to

10  declare that we breached the contract.

11         THE COURT:  Why didn't you sue ZAMWI?  I mean, this

12  is your action.

13         MR. VAUGHN:  Because RGF is the one who claims the

14  right to terminate the lease.  So we have to, at least from my

15  perspective, and maybe I am not smart enough, my understanding

16  would be we would have to go after the entity that is claiming

17  ownership of the property or the right to control who is

18  leasing the property.

19         THE COURT:  But your argument is that they don't have

20  any authority, but you still, I guess -- okay.  So I rule in

21  your favor.  ZAMWI comes in tomorrow and writes a letter and

22  says, yeah, we're terminating the lease, or whatever they are

23  going to do.  And you have got another action, right?  Is that

24  the way you see it?

25         MR. VAUGHN:  I think in fairness, that would be the

1  conclusion.  I mean, I have no reason to believe they would do

2  that, but if they did, then we would have to act accordingly.

3          THE COURT:  Okay.  Go ahead.

4          MR. VAUGHN:  I will try to jump to the end of this.

5  What ultimately transpired is through this early part of 2010,

6  is that RGF is going to go forward with the Kamran transaction,

7  and they're telling ZCDMW over and over and over again, stop,

8  don't enter into any more contracts, turn the money over to us.

9          THE COURT:  Right.

10          MR. VAUGHN:  And I understand RGF wants to couch that

11  in terms of, well, this is just suggestions.  Well, it

12  certainly was far more than suggestions.  As I again reiterate,

13  and I think it's important, that this wasn't just an isolated,

14  hand's length or arm's length landlord and tenant.  These were

15  parties in bed together that theoretically were marching

16  towards a common goal in this worship center.

17          THE COURT:  All right.  So they direct plaintiff to

18  stop all --

19          MR. VAUGHN:  Correct.

20          THE COURT:  I am with you, I agree.

21          MR. VAUGHN:  And then up to --

22          THE COURT:  They don't formally terminate.

23          MR. VAUGHN:  That is correct.  And I think that's key

24  to the entire transaction.  Under RGF's position, the lease was

25  terminated as of March 15, 2011.  They have said there has

1    never been an extension.  So they can't rely and don't rely on

2    the 2013 date.  They are relying on the 2011 date, March 15.

3            Well, what happens after March 15 is the most telling

4    of all.

5            THE COURT:  They get back in bed with you guys?

6            MR. VAUGHN:  Exactly.  As I already stated in my

7    memo, essentially --

8            THE COURT:  The money is spent and taxes are paid --

9            MR. VAUGHN:  Everybody has moved forward from that

10   point as if we have a lease.

11           THE COURT:  Right.  And there is a memorandum of

12   understanding as to what priorities should be put in place to

13   get things moving.  And after an eight-hour meeting --

14           MR. VAUGHN:  Correct.

15           THE COURT:  -- and it was signed by the parties, and

16   you're back moving towards construction.  Okay.  Then nothing

17   happens, right?

18           MR. VAUGHN:  Well, I would disagree in terms of

19   nothing happening.

20           THE COURT:  Well, there is no completion.  So the

21   issue comes back to where -- if we assume that this amended

22   lease has any validity, then we come back to March 15, 2013,

23   after equity requiring or waiver requiring the plaintiff be

24   given a two-year extension, we still get to March 15 of 2013

25   and there is no completion.

1          So if I find that the lease amendment actually is

2    proper with the right parties, then why aren't -- why isn't RGF

3    entitled to terminate at that stage?

4          MR. VAUGHN:  Well, I go back first that RGF isn't

5    claiming the right to terminate based on March of 2013.

6    They're claiming the right to terminate based on March of 2011.

7          THE COURT:  So this letter from the attorney saying,

8    we terminate, I'm not supposed to consider that?

9          MR. VAUGHN:  Well, the pleadings that have been filed

10   in this case by RGF state unequivocally that they never agreed

11   to any form of an extension.  And thus, the 2013 date only

12   comes into effect if there was a written extension.  And RGF's

13   position is because there wasn't, then the only termination

14   date that is operative is March 15, 2011.  That's the position

15   they've taken throughout this litigation.  Notwithstanding

16   whatever an attorney may have said at some point in time,

17   that's what's been done in this litigation.

18         THE COURT:  But if I don't like that argument and I

19   agree with you that their actions speak louder than words on

20   the equitable side, I still get to the termination of the lease

21   after an additional two years, right?

22         MR. VAUGHN:  No, sir, at least not from my

23   perspective because the lease amendment at that point is gone.

24   They have said, we're not going to abide by these deadlines

25   anymore by their actions, by their course of dealing over time.

1  And I think the Stanley Cafeteria case is the one that gives us

2  that enlightenment.

3         I mean, that had to mean something.  And I think

4  clearly it meant that come April 16 of 2011, no one considered

5  the lease as having been breached.  No one asserted the lease

6  had been terminated.  We were going to March forward, in

7  effect, taking the lease amendment out of the equation, and we

8  were back to the old lease with some parameters in the

9  memorandum of understanding.

10        And I guess it comes down fundamentally to whether or

11 not from -- you know, the Court has made the statement that you

12 find the memorandum to be an agreement to agree.

13        And that would be, I guess, our second fundamental

14 difference with the Court's point of view, is that this course

15 of dealing is clearly demonstrating that they intended the

16 memorandum to be something that was binding on the parties and

17 a way to move forward since their unrequited love affair with

18 the Kamran group, and now they are now back to their original

19 love for the second time around, ZCDMW.

20        And the three trustees that were present at that

21 meeting, which were the majority of the trustees, signed off on

22 this memorandum of understanding.  It contained specific

23 provisions of things they were going to do.

24        We assert that my client did what the lease -- the

25 memorandum of understanding required them to do.  RGF responds

1    shortly thereafter, yeah, we've got it, get all your money in

2    place and don't start building until you do that.

3           And that's exactly what the parameters of the MOU

4    were.  Now, maybe it should have been more formal.  Maybe in

5    the real world or in the ideal world it would have been a

6    series of meetings and this, that, and the other, but the

7    bottom line is all parties were acting and moving forward based

8    on the MOU.

9           And there was never a hint from RGF at any time after

10   the MOU was signed that the MOU wasn't the operative document

11   and that parties weren't proceeding in that fashion.  As the

12   Court has pointed out, my client continued to utilize the

13   property, pay all the expenses related to it.  And at the risk

14   of perhaps confusing things a little bit, if that's the way to

15   say it, this property was being used as a worship center.  It

16   wasn't sitting there vacate.

17          And that's one of the I think misimpressions at least

18   that RGF wants to bring to this Court.  My clients had

19   renovated the structure that was on the facility.  They were

20   holding worship services there as Mr. Shahryary said at his

21   deposition just a week before his deposition in early -- I

22   forget now whether it was January or February, but they had had

23   a worship service at the facility.

24          So it's just not sitting there as vacate land with

25   nothing going on.  The issue more in broad terms is, should

1   there be a more grandiose facility then there is physically

2   there as of right now.  But it is being used exactly for the

3   purpose that it was intended by ZCDMW, which is the entity that

4   was to use it for the Zoroastrian purposes.

5          So fundamentally I just cannot grasp, I guess, the

6   Court's interpretation of the MOU as an agreement to agree.  It

7   has specific parameters in it that the parties were and did in

8   fact follow.

9          And if RGF believed that the MOU was simply an

10  agreement to agree, then they would have taken some action

11  prior to sometime in 2013.  They would have said, the contract

12  was dead.  You can't sit for the better part of three years,

13  2011, the balance of it, 2012, 2013, parts of three years

14  anyway, and then say, oh, by the way, we're going to go back to

15  this prior document and say that you're in default and,

16  therefore, the lease is to be terminated.

17          THE COURT:  Okay.  Let hear from Mr. Ruhling.  Thank

18  you, Mr. Vaughn.

19          MR. VAUGHN:  Thank you for hearing me, Judge.

20          MS. RUHLING:  Your Honor, I would like to start, if I

21  could, with this point about --

22          THE COURT:  Okay.  I am going to be on the ninth

23  floor at 1 o'clock.

24          MR. RUHLING:  I will try and be brief, Your Honor.

25          THE COURT:  Good.

1              MR. RUHLING:  Let me start with this idea of is the

2    MOU the operative contract.  And I would direct the Court to

3    Exhibit C first and foremost to my motion for summary judgment.

4    Page 145 of Mr. Shahryary's deposition, starting at line 16,

5    and I quote:  Was the memorandum of understanding intended to

6    be a final agreement, or was it an expression of an agreement

7    to agree in the future to a plan?  Mr. Shahryary --

8              THE COURT:  I don't care about what these guys say to

9    each other about what it is now, three years later.  I look at

10   the four corners of the document and I say, is this a complete

11   agreement or not?

12             MR. RUHLING:  And, Your Honor, with respect to it

13   being a complete agreement for a lease, I think it clearly

14   cannot be.  You don't have a reference to a property.  You

15   don't have a reference to a duration of a lease.  You don't

16   have a reference to a rent.  You don't have a reference to

17   permissible uses or impermissible uses.

18             These are all things the Court would have to, for

19   lack of a better way to describe it, blue pencil into the

20   agreement for it to be a lease.  So we don't believe there is

21   any way that it can be an enforceable lease.

22             The question becomes -- the bigger question that I

23   think needs to be addressed up front is the standing issue that

24   plaintiff has raised.  And I think if you look at Exhibit I to

25   our opposition to the motion for summary judgment, you'll see

19

1   the assignment of the lease that is at issue.  And it was

2   produced in discovery, you can see the Bates label at the

3   bottom right-hand corner.

4          And if the Court looks at that, it will see that the

5   intent of it was assignee, which is defined to be ZAMWI, is

6   desirous of accepting assignment of the lessee's leasehold

7   interest and lessee's rights and obligations under the lease

8   agreement, and performing its obligations and agreements as

9   hereinafter set forth.

10         Which is consistent with the testimony that Dr.

11   Jahanian gave at his deposition, which was that basically they

12   were fed up with the fact that ZCDMW for nearly 18 years had

13   done essentially nothing with the property, and they were

14   interested in turning over responsibility for constructing this

15   facility to ZAMWI.

16         If you look at Exhibits F, G, and H to that

17   opposition, those are all affidavits from trustees.  And

18   attached to each of those are Exhibit 1, which they say that

19   they received, which is a letter from ZAMWI that starts out

20   dated October 24, 2008:  After careful consideration of the

21   offer made by the Guiv Foundation, we are writing to inform you

22   that the ZAMWI board of trustees has decided not to take the

23   assignment of the lease between ZCDMW and the Guiv Foundation.

24   They rejected it.

25         Now, if the Court were to go a step farther and lay

1  out Exhibit I and the lease amendment next to one another, the

2  Court will find something very interesting.  The language is

3  almost identical, adjusted only for the dates of the fact that

4  the assignment didn't take place, and instead ZCDMW agreed to

5  accept these construction deadlines.  That's the history of

6  this.

7        THE COURT:  Okay.

8        MR. RUHLING:  With respect to this argument that the

9  Guiv Foundation is somehow a wondering husband and they go to

10  Mr. Kamran when they like him, but then they come back, that is

11  entirely not the case and it is not consistent with any

12  testimony.

13        And in fact, plaintiff has cited to not a single word

14  in the record to support any of that.  It has all been

15  counsel's argument.

16        The actual testimony that came out is that the Guiv

17  Foundation has made a $100,000 donation to Mr. Kamran's

18  foundation.  That the Guiv Foundation continues to support Mr.

19  Kamran's goal.  I should say Mr. Kamran's family's goal, the

20  trust, because Mr. Kamran died.  And indeed, they've also tried

21  to work something with plaintiffs in this case, the memorandum

22  of understanding.

23        And what that was -- the only evidence of record

24  before the Court as to what that was appears in Exhibit F and

25  Exhibit H to our opposition, and those are the affidavits from

1    Dr. Jahanian and Dr. Sorooshian.  Dr. Sorooshian, the author of

2    that document, as he says in his affidavit, did not intend it

3    to be a lease, did not intend it to amend the lease.  Intended

4    it to be a recitation of what they discussed in the meeting.

5    And that it was an expression of what can ZCDMW do to regain

6    our trust so that in the future we will agree to a new lease.

7              THE COURT:  And what legal effect does it have on the

8    lease from 2009, the amended lease, that the plaintiff

9    continued to make all the payments as required by the original

10   lease for the taxes, et cetera?

11             MR. RUHLING:  Well, Your Honor, I think first and

12   foremost, you have to look to the original lease.  And I

13   believe it is paragraph 16.1 of the original lease which has a

14   provision that says that a failure to enforce strictly the

15   lease terms is not a waiver thereof.

16             And that is consistent with the Stanley Cafeteria

17   case which said:  Standing alone, an obligee's acceptance of

18   less than full performance by the obligor does not prove intent

19   to relinquish the right to enforce full performance.

20             There has never been any other document to control

21   the relationship between these two parties vis-à-vis the

22   property and construction of the property since the 2009

23   amendment was signed.  That's the last word the Court has.

24             And so, whether the Court looks to March 15, 2011, or

25   March 13 or March 15, 2013, the same conclusion obtains.

1    Plaintiff has never complied with the construction deadlines.

2         In fact, the Court could actually go one step farther

3    back to November 1, 2009, and could say that they were in

4    breach at that point.  As admitted in requests for admissions.

5    And that was Exhibit B, I believe, to our original motion for

6    summary judgment where they acknowledged that they had not

7    undertaken anything other than getting plans together, the same

8    thing they had done in the 18 prior years.  If you look at

9    recitation number 2 to the amendment, it says they have been

10   unsuccessful in their construction.  And then the language goes

11   on to say, they must start substantial construction by November

12   1, 2009.

13        Contextually, the only way that the Court can read

14   that and make sense of it, is that whatever they did before

15   January 2009 isn't construction, that the parties agreed to

16   that.

17        So they never started construction on November 1,

18   2009.  They never completed it on March 15, 2011.  They didn't

19   complete it on March 15, 2013.

20        And if the Court looks at Exhibit B to the opposition

21   to summary judgment, that is what was turned over in discovery

22   as being their accounting for expenses that they have paid on

23   this property during the life of it.  And the Court would

24   notice, starting on page 2, that first of all they really

25   didn't stop working after the March 2010 e-mail because the

1    third line shows an $18,000 payment to Bowman Consulting for

2    civil engineer professional consulting work on April 23, 2010.

3          And then if the Court looks, starting at page 4,

4    that's May 2011 through September of 2011, the only thing other

5    than state corporation fees or a thousand dollars for

6    landscaping is payments to the architect.

7          And then if the Court looks at the next page, that's

8    2012, and there is two property tax payments, a state

9    corporation tax, and a mail box fee, and a $130 for

10   landscaping.

11         And then starting at page 8, which is the 2013 time

12   frame, the only thing that the Court will find is State

13   Corporation Commission, the costs of this litigation, which

14   they have been paying out of donations, and property tax.

15         THE COURT:  I have got it.  All right.  Any final

16   word?

17         MR. RUHLING:  Your Honor, we believe that what the

18   Court started with is exactly the right answer.  And that is,

19   plaintiff has been in breach of this agreement, and that the

20   notice of termination is effective.  And we would ask that the

21   Court rule that way on summary judgment.  There is no real

22   dispute of any material fact at this point that would prevent

23   that.

24         THE COURT:  All right.  Thank you.

25         Mr. Vaughn, why isn't the -- and I don't have it in

24

1    front of me, but why isn't the rejection letter from ZAMWI the

2    end of the assignment issue?

3                    MR. VAUGHN:  I can only go by what Dr. Jahanian

4    testified to at his deposition.  It is on page 56 and 57 when

5    he was specifically asked, was there a document transferring

6    the lease from RGF to ZAMWI?  And he testified unequivocally

7    that there was a written lease or sublease that was executed by

8    all three parties.

9                    Exhibit I is not a document that is signed by any of

10   the parties.  And Dr. Jahanian never testified that that was

11   the document to which he was referring.

12                   THE COURT:  Was he shown that document?

13                   MR. VAUGHN:  Pardon?

14                   THE COURT:  Was he shown that document in the

15   deposition?

16                   MR. VAUGHN:  I don't know the answer to that.

17                   MS. GINSBERG:  I will answer that, Your Honor.  He

18   was not.

19                   THE COURT:  He was not.

20                   MR. VAUGHN:  But there certainly has been nothing in

21   the record to say that is the document because in large part

22   the document he referred to is one that is signed.  And that

23   one is not signed.  So that couldn't be the document.

24                   THE COURT:  What's the timing, Mr. Ruhling, of the

25   signed document and this rejection that you have --

25

1          MS. GINSBERG:  Your Honor, I will tell the Court that

2     saying that it was signed was as confused an answer as it was

3     when he said that the original lease amendment was drafted by

4     ZCDMW, in all candor to the Court.

5          THE COURT:  He's just wrong?

6          MS. GINSBERG:  He's just wrong.

7          MR. VAUGHN:  Well, but that's his testimony.

8          THE COURT:  So you haven't been able to find any

9     signed lease assignment in the --

10         MR. RUHLING:  I think first and foremost, Your Honor,

11    I think it was clear at the context of the deposition and it's

12    clear from this document, there was never an intent for Rustam

13    Guiv to relinquish its rights in the property.  The only

14    assignment that was ever there, if there was one, was taking

15    responsibility for the construction away from the plaintiff

16    because they couldn't do it.

17         THE COURT:  Right.

18         MR. RUHLING:  That's the only discussion that ever

19    took place there.

20         MR. VAUGHN:  That's not the testimony, that's the

21    problem.  I don't mean to interrupt.

22         THE COURT:  I mean, a full assignment would take away

23    the interest of RGF, right?

24         MR. RUHLING:  Well, if there was ever an effort for

25    RGF to relinquish its rights, it would.  Which would, of

1    course, beg the question of how did this case get where it got.

2    Because that means that plaintiff has sued, intentionally sued

3    the wrong party.  But I don't attribute that bad faith, trust

4    me.  I'm just saying, logically that's the way it plays out.

5             THE COURT:  But your point is RGF wasn't assigning

6    away its own rights, it was assigning away plaintiff's rights

7    to build?

8             MR. RUHLING:  Correct, Your Honor.

9             THE COURT:  Okay.

10            MR. RUHLING:  And that was in fact the part of the

11   testimony that Mr. Vaughn is not reading to the Court, was that

12   Dr. Jahanian explained that the responsibility for fund raising

13   and construction would go to ZAMWI under the assignment.

14            So whether he understood the legal technicalities of

15   who's assigning what as a lay physician from Iran, needs to be

16   taken into account here.

17            THE COURT:  Okay.

18            MR. VAUGHN:  I can only rely on his affirmative

19   testimony.  Without hesitation without question he said that

20   the lease on the Vienna property was transferred by RGF to

21   ZAMWI.  Not by ZCDMW to ZAMWI, but RGF.

22            THE COURT:  And you haven't received any documents

23   that --

24            MR. VAUGHN:  No document has ever been produced that

25   disputes that.

1          THE COURT:  That is consistent or inconsistent with

2    it?

3          MR. VAUGHN:  That is correct.  If can say one last

4    word.

5          THE COURT:  Yes.

6          MR. VAUGHN:  The MOU is clearly a part of the

7    original lease.  I fail to understand how one could say the MOU

8    is a stand-alone document.  I don't think there is any way you

9    can read it in that fashion.

10          THE COURT:  Okay.  All right.  I apologize, we have

11    got the welcome for the new members of the Federal Bar

12    Association at 1 o'clock on the ninth floor.  So I need to

13    recess at this time.  Have a good weekend.

14          MR. RUHLING:  Will the Court be issuing an order?

15          THE COURT:  We will continue to look at it.

16          MR. VAUGHN:  Thank you, Judge.

17          THE COURT:  And certainly issue an order.  It's

18    interesting and confusing when people --

19          MR. RUHLING:  And one of the reasons I ask, Your

20    Honor, is that I just -- my client has to travel from out of

21    state if we are going to end up at trial on this case and so --

22          THE COURT:  We will get you way before that.  And I

23    think that -- all right, we will get to you.

24          MR. RUHLING:  We appreciate it, Your Honor.

25          MR. VAUGHN:  Have a good afternoon.  Thank you,

1    Judge, for the time.

2             THE COURT:  And you continue to try to work this out.

3             MR. VAUGHN:  We will.

4    -------------------------------------------------
                           HEARING CONCLUDED
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19            I certify that the foregoing is a true and

20        accurate transcription of my stenographic notes.

21

22
                    /s/  Norman B. Linnell
23             Norman B. Linnell, RPR, CM, VCE, FCRR

24

25